Good morning, your honors. Richard Novak for appellant. Mr. Maize, may it please the court, and I'm going to try to reserve two or three minutes for my final, if I may, and I will watch the clock. Let me first start, if I may, with the standard of review in this situation. As your honors know, Mr. Maize filed a motion to withdraw his plea of guilty prior to sentencing, and under the Federal Rules of Criminal Procedure, that motion must be granted whenever the defendant presents a fair and just reason. Now, there's an abuse of discretion standard of review, but what I think is unique about this particular rule is that this court has said in numerous cases, and most recently in the McTernan matter, that this is a standard which is generous and, quote, must be applied liberally, close quote. And that's from McTernan and many other recent cases from this court, including Davis and Garcia, and even Showalter, which I'll discuss in a few minutes, which the government thinks should control, at least on the facts in this case. Very briefly, as your honors know, Mr. Maize waived indictment in this matter and pled guilty to an information, and prior to entering his plea, in fact, prior to executing the plea agreement, he asked the government to provide him with pre-indictment discovery, which the government declined to do. After he entered his plea and prior to sentencing, the government then produced thousands of pages of discovery, primarily FBI reports, and within those documents were found statements by cooperating co-defendants represented by counsel. Also people that he knew and had a business relationship with, a very close business relationship. Well, people who the government alleges he conspired with. Well, I understand that. Yes. So the question is why, you know, this is, you're arguing newly discovered evidence, but I think as I read your discussion with Judge Pragerson at the hearing, you backed down, I don't mean that pejoratively, but you backed off and said, well, at least it's newly available. So what does the record reflect in terms of Mr. Mazes and counsel's ability to have gone off and talked to the people you're now relying upon as corroborating his view that he didn't really have knowledge of the material, as you put it, the material fraudulent aspects. The material nature of the false appraisals. Well, you knew some of it was false. I'm sorry? You knew some of it wasn't true. Well, I think the court's. But in any event, what was the evidence about inability or efforts or whatever to simply go out and talk to these people and find out what their stories were going to be? Well, I think Your Honor has focused on what I think is the primary question in this appeal, which is whether it really is newly discovered evidence under this court's precedent in the context of. What was a fair amount of that saying? And can I just get an answer to my question? My question was, what's the evidence show about what efforts were made, if any, to elicit information from the co-defendants? Well, the evidence does include statements by Mr. Fitzgerald, who was not one of the, well, whose statements were not. Counsel, I'm asking what are the efforts made to talk to. Now you're telling me about what one of the co-defendants may have said or not. What was the effort on Mr. Mays' counsel's part? There was no effort. None at all? Other than to ask the government to produce discovery pre-indictment. So is there some rule in the criminal process that says you can't go talk or ask to talk to a co-defendant? No, there is certainly no rule, although I think that. You were part of the team, as I understand. No, actually, Your Honor, I was not. I thought you said you were involved with O'Melveny at the time. No, that's not correct, Your Honor. You were not at O'Melveny, but you were. Mr. Mays terminated his relationship with O'Melveny and Myers shortly after he entered his plea, and he retained two new attorneys. I was one of them and a gentleman from Colorado. So what Your Honor is asking is did his prior counsel, O'Melveny and Myers, make any effort to interview anybody who was in possession of this exculpatory information? And the answer is the record reflects from Mr. Fitzgerald that nobody from O'Melveny attempted to contact him, and the record also reflects an interview with his counsel, Mr. Rosen, who said, this is all in the motion, that nobody from O'Melveny attempted to contact him. I have a set of questions, but wasn't the same evidence quite inculpatory in many ways? Well, I think that when a cooperating co-defendant tells the government, these are all the people who knew about this. You're again not answering the question. No, I think the answer is that the cooperator statements are both inculpatory and exculpatory, and that's why it's not impeachment. All right. Now, in terms of exculpatory, what exactly was said? Let me back up a minute. When did you actually get this information? A year after Mr. Mays entered his plea. Okay. And when did you move to withdraw the plea? A couple years later. Okay. Why? Why isn't that relevant? Well, I think that it is a relevant inquiry. What this Court has said in Garcia is that delay, number one, does not defeat this motion when there are fair and just reasons. And number two, it is really – I'm sorry? What's the fair and just reason other than there was a trial in between in which some of the defendants did better than it appeared they might have done? The fair and just reason is the newly discovered evidence that the government refused to produce prior to the plea. Okay. But what was the fair and just reason for not doing anything for two years after that? With all due respect, Your Honor, I don't think the test is whether there was a fair and just reason earlier. What this Court has said in many cases, especially in Garcia, is that the question of delay is whether the defendant's reason for moving to withdraw the plea, as stated in the papers, appears to be sincere and legitimate. Well, isn't it relevant to that? Very relevant to that? The fact that the information was acquired two years and in the middle there was a trial of the other co-defendants and that the plea withdrawal motion could have been made two years earlier, isn't it really relevant to the question of why it was being done? Yes. And the one fact that I think establishes that the delay has nothing to do with I could have done better is that the United States Probation Office recommended to District Judge Pragerson well before Mr. Mays moved to withdraw his plea, before, that he serve one day in custody. Well, exactly. But his concern in the long run was being exonerated, not serving anything, not the sentence. Well, his concern in the long run was that the government disclosed what we believe is exculpatory information after he entered his plea. After, under a plea agreement, he paid $3 million, actually wrote checks to RBC for $3 million before he was ever sentenced. And so the question is when you have that kind of a plea agreement and the government is holding evidence that we view is exculpatory and I don't think it's newly available. I think if your honors look at your recent decisions in Garcia and in Showalter, you will see why this is not newly available evidence. And I'm not trying to step away, Your Honor, from your question. It appears that you are, actually. Well, okay. The delay, I think, is well explained by the change in counsel, the volume of discovery. The change in counsel was two years. Was the information disclosed before or after the change in counsel? After. Right. Okay. So that doesn't explain that. So go ahead. So. I still haven't heard an explanation for the delay. Well, I think that the explanation for the delay is largely on counsel's shoulders because counsel is given thousands and thousands of pages of government discovery. It is a huge paper case in advance of that. Counsel then need to interview Mr. Fitzgerald, who at some point does come to California because he's on the government's witness list in the trial that involved Mr. Grasso and others. That couldn't have been it because you said the problem was the newly discovered evidence, not interviewing anybody. Well, no, I think it's both. I'm not trying to separate. There's three sources of newly discovered evidence. Two of them, I would submit, were within the government's custody and control and should have been disclosed prior to trial. And I think that this Court's decision prior to the plea, excuse me, and I think that this Court's decision in Sanchez and I think that the new Supreme Court cases about plea negotiations being a critical stage of the proceedings for Sixth Amendment purposes makes it very clear that when you ask a man to come into court or a woman and plead guilty without getting any discovery and the government has in its hands statements. Then my last question is what exactly were the statements? Okay. It didn't seem to me they were all that exculpatory. Given, well, first of all, was he being, was the theory on which he was being tried dependent in any way on him participating in the large inflation in the prices of these homes as opposed to the inflation that he knew about and the straw buyers that he knew about? In other words, how did it matter to his culpability? I'll tell you how it mattered. The sine qua non of this scheme was Mr. Abrams and Mr. Fitzgerald's and the appraiser's ratcheting up of appraised values two or three times. And we're talking about million-dollar properties. Okay? So what Mr. Fitzgerald told us and which is in the record is that Mr. Mays assumed that there was a 1% or 2% variation in the value of properties that are in millions of dollars and where you have a 40% to 60% down payment. But were there other material statements that he knew as well? For example, the verification of deposits, the use of straw buyers? Those are all very good questions. And the government says that because he doesn't dispute knowing about all those things, that's in a sense defeats the relevance of this exculpatory evidence. What we said in our papers, and I think this is reserved for the record, is that the materiality of different what folks might call badges of fraud is a question for the jury. And where you have 40% down payments and where Mr. Mays was told by Mr. Abrams that he purchased these properties and sold them to a partnership and increased the sale by 1% to basically take a fee to sell it to his partnership, the question is what is material? The most material aspect of this entire scheme of Mr. Abrams and Mr. Fitzgerald is the appraisals. Mr. Fitzgerald told us and we told the judge. It may be the most material, but it may not be the only material. Well, it may be, though, and I don't mean to cut you off, Your Honor, but I think materiality is a jury question. Well, that's fine, and people can plead guilty and not go to the jury. And the question is whether being advised, as he apparently was, that with or without knowing about the 40% increases, he was still likely to be found guilty of the charges, was that in any way erroneous advice? Well, we're not – it is really my goal to answer your question directly. We're not here saying that there was an ineffective assistance of counsel in a constitutional context. That is not the standard. Was he told or did he have reason – was he for some reason basing his plea on the notion that it could be proven that he knew the larger scheme? Or that – were they even alleged that he knew the larger scheme? Well, the plea agreement speaks for itself. I wasn't present in his discussions with O'Meldy. All right. But what are the facts that are alleged as – excuse me. What are the facts that are alleged as the factual basis? Do they include that he knew about the larger scheme? It includes every possible misrepresentation that the government could come up with and put in a plea agreement and put before a man who was told if you don't sign this, you're going to go to prison for 16 years. What do you mean every possible misrepresentation? All of them. It includes everything. It includes that he knew about this? Pardon? It includes that he knew about the large misrepresentations with regard to the appraisals? The appraisals? No. Actually, the most interesting part of the factual basis is that it is vague as to the extent of his knowledge of the appraisals. And I don't – I wasn't there for the negotiations because I didn't represent him at that stage. But that's because they didn't think anything turned on him. No. I think it's actually because there was a fact. If you want to – I think the Court's inviting us to speculate. I think that there was a significant lack of a consensus between Mr. Mays and his counsel and the government as to what he knew about the appraisals. Also, Mr. Abrams. And the government knew from Mr. Abrams, the star of this whole scheme, he had told the government – this answers Your Honor's prior question – that he didn't know that Mr. – Mr. Mays didn't acknowledge knowing about the nature of the appraisals until after Mr. Mays called him and found out that these appraisals were dramatically false. And that was well after the transactions had ended. You may want to set the balance of your time. You're down to a minute.  Thank you very much, Your Honor. Thank you. Good morning, Your Honors. May it please the Court, Jeremy Matz for the United States. Good morning. Good morning. I was and still am the lead prosecutor on this broader investigation, including not only the negotiations and the plea agreement with regard to Mr. Mays but also the trial of his co-conspirators and all of the various appeals that have stemmed out of those cases. I have relatively little to say, I think, in light of the Court's comments. I would like to clarify some of the key steps in the chronology because I think that's relevant. And certainly in light of the Court's questions, I think it's a relevant issue and one that the Court is correct to focus on. When I talk about the chronology, I don't necessarily mean the chronology of Mr. Mays' crimes but rather the chronology of the negotiations and the production of discovery and the subsequent motion to withdraw the plea, things of those nature. Can I just ask the same question I asked of counsel but from the government's side? Was there any impediment in the record, supported by the record, about the ability of Mr. Mays to contact or his counsel, obviously investigators or whatever, to contact his putative co-defendants to gather some kind of insights as to what their positions were? There was absolutely no impediment, Your Honor. At any time. No gag order or any kind of? Absolutely not. There was no protective order issued by the District Court. There was no gag order, as the Court, as Your Honor mentioned. I'm assuming they were all lawyered up by that point. They were, correct, Your Honor. Mr. Abrams, head counsel, that point, of course, means different things in this case. With regard to, let's say, March of 2008, when the discovery was first produced to Mr. Mays' counsel, at that time he received statements of Mr. Abrams and Ms. LaViolette and also, in fact, Mr. Fitzgerald.  Yes, that's correct, I think. At that time, Mr. Abrams, head counsel, Ms. LaViolette, head counsel, but they were, there was no impediment of any kind, certainly no legal impediment, not any placed by the government, not any placed by the District Court. And as the Court has, I think, probably focused on, it appears that at that time, meaning March of 2008 and even subsequently in June of 2008 when he received additional discovery, Mr. Mays and his counsel made no efforts at that time to reach out to any of these witnesses. Mr. Fitzgerald, by that time, March of 2008, was back in Los Angeles in custody, of course, head counsel, but again, no efforts were made at that time by Mr. Mays or his counsel to reach out to him either, Mr. Fitzgerald, through his counsel. With regard to... I must say that I'm not sure what the relevance of all that is because it seems like the weakest part of the argument because the fact is the government did have statements and he didn't have them, and whatever he, if he had talked to Mr. Fitzgerald or Mr. Havens or anyone else, they might not have told him what they had told the government. The point isn't whether he knew of them and could talk to them. The point is whether he knew of their statements to the government, which he didn't. So if that's relevant, I don't see why it's relevant that he had access to them. Your Honor, I think it's relevant because it factors into the issue of delay and the issue of delay on the part of Mr. Mays in bringing his motion in turn is relevant because that factors into, as this Court has stated, it is a barometer or at least one barometer in assessing the candor of the defendant when he proffers his reasons for moving to withdraw his plea. In this case, as the district court observed at the hearing on the motion to withdraw the plea, the district court was concerned about, as he put it, an undercurrent or a theme that might have been motivating this motion. The theme essentially being Mr. Mays waited until all the other co-defendants had been sentenced and he could then know what their sentences had been, as Your Honor pointed out, I believe, many cases resulting in sentences more lenient than perhaps he or even those co-defendants had expected. And only at that time, after observing all these sentences, did he then move to withdraw his plea. But his actual sentence was 18 months. Is that right? Mr. Mays is correct. So even on that level, but he didn't know that at the time. Was the plea withdrawal request made before or after the sentencing? The motion to withdraw the plea was made before sentencing. Right. So he didn't know at that point. Correct. That's correct. But he did know what everybody else had been sentenced to. What was the sentence range on the tax fraud issue? Your Honor, I would have to go back and look at the plea agreement to give a totally precise answer to that question. I believe for sentencing guidelines purposes, that count was grouped with the other counts. So standing alone as to its own offense, I will come back to that in a moment. In Mr. Mays' plea agreement, there was a guidelines stipulation as to the guidelines calculation for the tax count. It seems that the stipulation on that count, according to the parties, was a total offense level of 16 prior to adjustment for acceptance of responsibility. Subtracting three levels, that would have resulted in a 13, which, as I recall, generally for a Category 1 defendant results in a range of 12 to 18 months. So the sentence that he received was even within the range of the standalone tax account, had that been the only count of conviction that he had ever been sentenced on. Did anything in the statement of facts for the plea agreement turn on whether he knew about the large inflation in the appraisals and the sale of the house? No, Your Honor, and that's exactly the next point that I was on my way to, and it's a very important point, and I'm glad Your Honor raised it. The answer to that question is unequivocally no. As the Court can see by reading Mr. Mays' factual statement in connection with his plea agreement, Mr. Novak calls it a vague discussion of what he knew about the appraisals. I would actually say it's not vague at all. There was an explicit statement in his plea agreement to which the government agreed that he was not aware of the full degree of inflation of the appraisals, but he admitted being aware of some degree of inflation of the appraisals. At the plea agreement colloquy, I believe it was the Rule 11 colloquy, his counsel at that time, O'Melveny Myers, or perhaps this was later than that in her declaration, Ms. Carolyn Kubota's declaration stated that she believed all along that Mr. Mays was not in full possession of all of the facts regarding the inflated nature of the appraisals. So the point being here, as Your Honor correctly observed I think in questioning Mr. Novak, Mr. Mays' plea did not depend in any way on him knowing the full extent of the inflation on the appraisals in this scheme. It never did. That was never required, and in fact he never agreed to that. But nonetheless, he still agreed at the plea agreement, at the Rule 11 colloquy, and even I think about two years later when he spoke to the probation office, he still agreed at all those points in time that he knew about other lies, who the borrowers were, who was living in the homes, who was buying the homes, where the money for the down payments was coming from. The concealment of the very material fact that he, Mr. Mays, was receiving hundreds of thousands of kickbacks on each and every one of these loans outside of SRO in ways that were never disclosed to the lenders. As to the exculpatory evidence, he asserted the exculpatory evidence, what was it? I thought Mr. Abrams said something like he didn't know the full extent of the fraud, which could have meant he didn't know how many houses there were. It could have meant a lot of things. Correct. What else was there? I believe, Your Honor, Mr. Mays points to what he deems an exculpatory piece of evidence, a statement given by Nicola Violette to the effect that she and her boss, Mr. Abrams, used Mr. Mays' stationery or stationery from his company, AmeriCorps, to send information to the lenders without his knowledge, without Mr. Mays' knowledge. In other words, also, wasn't there a statement that they wouldn't have told him about the full extent of things, that he never would have gone along with that? I think there was such a statement that he cites given by Mr. Fitzgerald. His theory seems to be that, look, everybody was doing this in that era, you know, fudging on the status of the buyers, fudging. And if this had gone to the jury and he had had the corroborative statements of the co-defendants saying, yeah, we kept him out of the loop, so what he's guilty of is kind of sleazy practices, but it's not criminal and it's not material. Because his argument is, look, the jury could have looked at this and decided, yes, he was culpable in that he knew there were lies and there was fudging going on. But, you know, he's small fish in this, and they could have acquitted him on that ground. So under that theory, I don't understand, and I'm going to ask counsel to respond on it when he gets up, but the IRS, the tax fraud, I know his theory is, at least it was advanced before Judge Pragerson, was that this was the beneficence of Mr. Abrams and he really didn't need the money, but it was a nice gesture, so he took all this. And why he didn't report it as income and so on and so forth, that's his. That doesn't depend on any of these other statements. That's his alone. So what was the government's theory on that one? On the tax count, Your Honor? Yeah. How does that – is there anything in the newly discovered evidence that would have affected the tax? Absolutely not. Absolutely not. That's another good question and a good point, and we've made that point in our papers. The tax count is a standalone count that doesn't even depend, of course, on the money ever having been dirty. So since it does not depend on the money ever having been dirty, the money that he received but did not report, by definition it also does not depend on there having been any inflated appraisals. Thank you. Can I just back up a minute? Yes, ma'am. All of this, though, has to be bounced off against a standard for withdrawal of pleas that is supposed to be generous and that one can see why it should be generous. I mean, there's no – unless there's some – so the question is, is there any reliance factor or any reason why allowing the withdrawal of the plea in this instance would be an unusual problem? I understand there was a delay, but aside from that? Would it be an unusual problem? I'm not sure if I understand. What I mean is why – although we're sort of nitpicking the whole evidence and saying, well, he didn't – the reasons he's given don't seem so terrific. But still, why not let him withdraw his plea if that's what he wants to do? Why – I mean, why did the – Judge Pragerson – I mean, the fair and just reason is essentially that, you know, I made a misjudgment or my – at least it appears now that I didn't understand the actual risks and I would like to start over again. Let's just say that's all this is about. Why isn't that a fair and just reason? Well, because, Your Honor, if the real reason is I, Mr. Mays, didn't really understand correctly before what the real risks were meaning in this case, I didn't understand that there was virtually no risk either to going to trial or to pleading, because that's really, I think, what the only correct takeaway is on this. In other words, as Your Honor, I think it was properly pointed out when Mr. Novak was making his argument, it appears that what Mr. Mays was really or is by now really most concerned about is being exonerated if possible, in other words, escaping any felony conviction. If he were allowed to do that, he could presumably maintain his real estate license. He could potentially continue to work as a mortgage banker. There would be various consequences that might befall him as a result of a felony conviction that would not befall him if he never had one. So if the calculus going on in his mind is really now that I see that even people that went to trial or people that pled guilty to essentially the same kind of felony that I pled guilty to got a very lenient sentence, I'd like to now take my opportunity to go to trial, see what happens. Maybe I win, and if I don't win, at least I know I'm not going to get a very high sentence. That's not, I think, the kind of appropriate fair and just reason. I'm asking you why not. Because, Your Honor, that's not the way the guilty plea process in the system is supposed to work. The guilty plea process in the system is supposed to work as follows, essentially. For defendants who are factually guilty and who are ready to come into court and admit that, that formal serious stage in the proceeding is meant to be somewhat final, not totally final, of course. There are opportunities to undo that. That's what the fair and just reason system establishes. Generously applied. Generously applied, correct, Your Honor, but not applied in every case is essentially a giveaway. And I think that that's really what would be the result here. If this court were to reverse Judge Pregerson's decision, find that he abused his discretion in considering all the facts in this case and actually order him to grant the motion to withdraw the plea. I would also point out, of course, that in this case, as we explained to Judge Pregerson, there was a real issue of prejudice to the government and to the district court by virtue of the timing. Because had Mr. Mays made this motion at any point during the approximately two or even three years when he could have, before the trial of his co-conspirators began, he would have been indicted along with them. He would have been tried along with them. That's really what I was asking you. Yes. And that's a serious concern, especially in this case, given the fact that it was a prolonged, heavily litigated six-week trial. The court is about to hear an appeal from that trial later today with regard to a different defendant. And Mr. Mays waited until all that had gone by, in possession of the evidence that he now claims was so material. And only then, after all that had happened, did he move to withdraw his plea. I think under the facts of this case with regard to that issue, I think it's clear that the district court did not abuse its discretion in evaluating all the facts and deciding that there was no fair or just reason here. Thank you very much. Did Your Honor want to ask me a question before I close?  The stand-alone on the tax fraud, the range of sentencing there would have been 18 months. None of the newly discovered evidence exonerates him from that. So you're saying he should be able to withdraw his entire plea and take his chances on the tax fraud as well? Well, I think the tax count is, frankly, the tail that wags the dog. Mr. Schiff, who was Mr. Mays' business partner, as Your Honor knows, pled to that count and received a six-month sentence and a $100,000 fine. As a felony? Yes, as a felony. So he still got the felony? Yes. And what Mr. Mays says in his motion to withdraw the plea, and this Court has said that a claim of innocence is not necessary, but is often a very important thing to look at, is that he had a defense to the tax fraud, which was that Mr. Abrams and Mr. Abrams' family owed Mr. Mays money. He viewed it as an offset. Whether or not that would have been an appropriate accounting technique for a tax return or not. But that wouldn't be affected by the newly discovered evidence? I'm sorry? That wouldn't be affected by the newly discovered evidence? No, that would be affected by, essentially, the tax count, and this, I think, is in the record in Mr. Mays' declaration. I was told I need to plead to a tax count also if I want to avoid indictment, and I think Your Honor saw the excerpts from O'Melveny's PowerPoint about how long he would go to prison if he didn't waive indictment. How long he would go to prison or what his exposure was? Well, I understand the subtlety among judges and counsel, that there's a big difference between what the guidelines say and what might happen, but when a law firm or an attorney, any attorney or law firm, can tell somebody who's not part of the criminal justice system, this is what your guidelines are. And we have this brand new case that just came out called Booker, and we don't really know what's going to happen, but your guideline is 6 to 10 years? That's the guideline. That's right. That's exactly what it is. That's telling him what he's facing. That's right. Did you have anything more you wanted to? Well, I think that Judge Berzon asked Mr. Matz the right question, which is what is Mr. Matz's motivation, and why shouldn't a man who pleads guilty at a time when the government refuses to give him information, and he has been told by his counsel, we can't corroborate that you didn't know about these appraisals, meaning we didn't try to interview anybody. We didn't try to interview Mr. Abrams. Isn't that the same as saying I didn't realize the strength or weakness of the government's case, and have we ever held in the circuit that that would establish a fair and just reason for withdrawal? Absolutely. United States v. Garcia says exactly that, exactly that, that very frequently a defendant's decision to plead guilty is based on his assessment, and when the assessment changes, we need to look at that and respect that. The guilty plea factual statement specifically did not plead to acknowledge of that. The guilty plea, the factual basis in support of the guilty plea does say that he had an understanding about the inaccuracies in the appraisal, but it doesn't say that he knew what the inaccuracies of the appraisal were, and what Mr. Fitzgerald says is that we told him it was 1 to 2 percent, that it was basically our fee to our partnership, and this scheme would not have been of anybody's interest, and I don't mean the government, I mean Mr. Abrams, if it wasn't for the appraisals, because the appraisals is the way Mr. Abrams and Mr. Fitzgerald got millions and millions of dollars to support their lifestyle. Okay, I think you've answered the question. And I appreciate the court's time. Thank you. Thank you, counsel. The case argued is submitted.
judges: Fisher, Berzon, Nguyen